DAS:LXN/RLC/TF
F. #2010R01746

**15 M 0475**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

RODOLFO QUIAMBAO,

    Defendant.

- - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(18 U.S.C. § 666(a)(2))

EASTERN DISTRICT OF NEW YORK, SS:

    MADELINE GORRA, being duly sworn, deposes and states that she is a Special Agent with the Internal Revenue Service, duly appointed according to law and acting as such.

    In or about May 2007 and January 2011, within the Eastern District of New York and elsewhere, the defendant RODOLFO QUIAMBAO, did knowingly, intentionally and corruptly give, offer and agree to give one or more things of value, to wit: checks and cash payments, to three individuals, referred to herein as CW #1, CW #2 and CW #3, all agents of an organization, to wit: Consolidated Edison of New York ("Con Ed"), which received in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance in one or more one-year periods, with intent to influence and reward CW #1, CW #2 and CW #3, in connection with business and one or more transactions and series of transactions of Con Ed involving things of value of $5,000 or more.

    (Title 18, United States Code, Section 666(a)(2))

The source of your deponent's information and the grounds for her belief are as follows:[1]

I. <u>Background and Qualifications</u>

1. I have been a Special Agent with the Internal Revenue Service ("IRS") for over fourteen years. In this position, I have been involved in the investigation of numerous cases involving violations of federal criminal laws, including tax fraud, tax evasion, bribery, money laundering and various forms of white collar crime. I have conducted physical surveillance, interviewed witnesses, reviewed documents obtained through the service of subpoenas and used other investigative techniques to secure relevant information for use in criminal prosecutions.

2. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including bank records and witness interviews; and from reports of and conversations with other law enforcement authorities, including agents of the Department of Homeland Security and investigators with the Office of the Inspector General of the Port Authority of New York and New Jersey, involved in the investigation.

II. <u>Consolidated Edison of New York</u>

3. Consolidated Edison of New York ("Con Ed") is a New York-based corporation that provides electric, gas and steam utility services in New York City, including within the Eastern District of New York, and Westchester County. As a provider of such

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

utility services, Con Ed is responsible for the construction, maintenance and repair of its electric, gas and steam systems. As part of its electric system, Con Ed constructs and maintains various facilities, including generating stations, and transmission and distribution substations.

4. Con Ed received federal funding in excess of $10,000 in each of the years from 2007 through 2011.

5. During these years, Con Ed entered into contracts with outside contractors and vendors to provide services. Con Ed awarded these contracts in several ways, including but not limited to, through a competitive bidding process, in which multiple companies submitted proposals and fees to perform services for a project, or through a "sole source" contract, in which a single company was offered a contract to perform services.

III. The Defendant

6. The defendant RODOLFO QUIAMBAO is the president and Chief Executive Officer of an engineering/design firm named Rudell & Associates, Inc. ("Rudell") that specializes in electrical design. Rudell's main offices are located in Queens, New York.

7. From at least 2001 to January 2011, Rudell performed, among other things, design/engineering work under contracts with Con Ed, including the creation of plans and designs for new electrical control systems and public improvement projects, as well as drafting new diagrams, maps and schematics relating to existing Con Ed electrical control systems. Rudell was awarded contracts from Con Ed through the competitive bidding process and through sole source contracts.

8. The defendant RODOLFO QUIAMBAO also controlled a company named Rudicon Power Corp. ("Rudicon"). New York State records indicate that Rudicon was

incorporated in New York State, and listed the defendant as its president and had the same corporate address as Rudell, in Queens, New York.

IV.   Con Ed's Standards of Business Conduct

9.   Con Ed set forth certain rules and regulations for its employees and contractors in its "Standards of Business Conduct" (the "Standards of Business Conduct"). The Standards of Business Conduct were disseminated to all Con Ed employees through its corporate handbook and by letter provided every other year.

10.   Under Section 4.0, "Avoiding Conflicts of Interest," of the Standards of Business Conduct, Con Ed employees were advised that "[c]onflicts of interest occur when an individual's personal interest interferes with the interests of Con Edison as a whole." Specifically, employees were advised to "be sensitive to even the appearance of favoritism, collusion, or personal gain in awarding or administering contracts for goods and services. . . . [and] will disqualify ourselves from *any* involvement in procurement actions (including evaluating contract bids or specifications, as well as appraising or inspecting vendor performance) with a firm in which we or any member of our family or household . . . has a direct or indirect interest. . . ."

11.   Moreover, the Standards of Business Conduct also required Con Ed employees to notify Con Ed's General Auditor of any potential conflicts of interests, which were defined to include, among other things:   (1) any compensation they received other than from Con Ed, (2) any compensation they received from a contractor or vendor of Con Ed, (3) any ownership/proprietorship interest they had in any outside company, especially if the employee received any gifts, loans and/or compensation from that company, and (4) any other conduct by the employee that may interfere with that employee's evaluation of contract bids

and specifications, as well as appraisals and inspections of the performance of a contractor or vendor.

12. On or about January 14, 2009, I participated in the arrests of eleven employees of Con Ed based on federal arrest warrants issued in the Eastern District of New York relating to charges of receiving bribes from a contractor (the "2009 Con Ed Arrests"). The arrests were publicized by the news media.

13. Based on my review of Con Ed records, on or about January 14, 2009, Con Ed emailed memoranda to its employees advising them of the arrests.

14. On or about January 20, 2009, Con Ed sent its outside contractors a letter, reminding them that Con Ed's "Standards of Business Conduct" prohibited its employees from receiving "gifts or benefits when they are offered on the basis of a current or potential business relationship." In the letter, Con Ed also advised its contractors to "immediately report" any "unethical or illegal activities, which would include any solicitation made by a company employee to a contractor." Finally, the letter also informed its contractors that they were required to attend a meeting at which these issues would be discussed. Based on my review of Con Ed's records, the defendant RODOLFO QUIAMBAO attended the required contractor meeting on February 2, 2009.

V. Defendant's Bribery of CW #1

    A. The Scheme

15. A cooperating witness ("CW #1") is a former employee of Con Ed.

CW #1 was a Section Manager in Con Ed's Electrical/Control Systems Design section.[2] CW #1's duties included overseeing the design of electrical control systems within Con Ed's generating stations and substations, which included the preparation of project specifications, and the review of bids and technical proposals. In this capacity, CW #1 had influence over the process by which contracts were awarded to design/engineering contractors and the approval of payments to these contractors.

16. From at least 2007 through 2010, CW #1 accepted kickbacks in the form of checks from the defendant RODOLFO QUIAMBAO in connection with projects Rudell performed for Con Ed that were supervised by CW #1. Specifically, CW #1, among other things, (1) steered Con Ed work to Rudell, including by making sure that Rudell was placed on bid lists and given the opportunity to bid for Con Ed projects; (2) supported the awarding of contracts to Rudell; and (3) reviewed and authorized payments to Rudell under those contracts.

17. Based on my review of Con Ed records, from at least 2007 to January 2011, Rudell was awarded Con Ed contracts under which it provided engineering and design services for electrical power systems that were managed and overseen by CW #1. During this time period, Rudell received approximately $30 million in payments from Con Ed, which were approved by CW #1.

B. Payments from Defendant to CW #1

---

[2] CW #1 was arrested in January 2011 on a complaint charging CW #1 with receiving bribes from the defendant. CW #1 subsequently pleaded guilty, pursuant to a cooperation agreement, to receiving bribes in the form of checks from the defendant, in CW #1's capacity as an employee of Con Ed, in violation of 18 U.S.C. § 666(a)(1)(B). In exchange for this cooperation, CW #1 is hoping to receive leniency at sentencing. CW #1's information has been corroborated by, among other things, bank records, business records and witness statements. CW #1 worked at Con Ed from 1984 until his arrest.

18. According to CW #1, from approximately May 2007 through December 2010, the defendant RODOLFO QUIAMBAO paid CW #1 kickbacks in the form of checks made payable to a company owned by CW #1 ("the CW #1 Company").

19. According to CW #1, one of the purposes of the CW #1 Company was to serve as a conduit for bribe payments from the defendant RODOLFO QUIAMBAO; CW #1 used the money for CW #1's personal use. At no point in time did CW #1 disclose the existence of the CW #1 Company or the fact that CW #1 was receiving payments from the defendant RODOLFO QUIAMBAO to Con Ed's General Auditor or anyone else at Con Ed.

20. I have reviewed bank accounts for the CW #1 Company that reflect that the defendant RODOLFO QUIAMBAO made payments to CW #1 via checks made out to the CW #1 Company.

21. Between May 2007 and December 2008, approximately 120 checks were issued from Rudell to the CW #1 Company for approximately $2.7 million. These checks appear to have been signed by the defendant RODOLFO QUIAMBAO.

22. Between January 30, 2009 – after the announcement of the 2009 Con Ed arrests — and December 22, 2010, approximately 146 checks, totaling approximately $3.7 million, were issued from Rudell to Rudicon. About 146 corresponding checks were then issued from Rudicon to CW #1's Company, for approximately $3.7 million. These checks appear to have been signed by the defendant RODOLFO QUIAMBAO. Based on my training and experience and knowledge of the investigation, it appears that the defendant RODOLFO QUIAMBAO issued checks from Rudicon – a company he owned that did not receive any payments from Con Ed – to the CW #1 Company in order to conceal his payments to CW #1.

8

23. Notably, many of the checks issued from Rudell to Rudicon referenced in the memo line specific projects that Rudell was currently performing for Con Ed, which were supervised by CW #1. In general, after the issuance of such checks from Rudell to Rudicon, checks in approximately the same amount were issued from Rudicon to the CW#1 Company. Many of these checks also referenced the same Con Ed project.

24. For example, a check dated February 19, 2009 in the amount of $67,570 was issued from Rudell to Rudicon. A subsequent check dated February 27, 2009 for the same amount was then issued from Rudicon to the CW #1 Company. The memo section of both checks appeared to reference "ER Auto," which based upon a review of records, was a project supervised by CW #1 that Rudell performed for Con Ed.

25. Similarly, a check dated December 23, 2009 in the amount of $98,000 was issued from Rudell to Rudicon. A subsequent check, dated December 24, 2009, was then issued from Rudicon to CW #1's Company, for the same amount. The memo sections of both of these checks referenced "PST Redline," which based upon a review of records, was a project supervised by CW #1 that Rudell performed for Con Ed.

VI. Defendant's Bribery of CW #2

    A. The Scheme

26. A cooperating witness ("CW #2") is a former employee of Con Ed. CW #2 was a Section Manager in Con Ed's Construction Public Improvement unit ("CPI") for all engineering projects performed by that unit in the boroughs of Brooklyn, Queens and Staten Island, as well as all bridges within New York City and Westchester County.[3] CW #2's

---

[3] CW #2 was arrested in December 2011 on a complaint charging CW #2 with receiving bribes

duties included overseeing engineering construction projects within CPI and supervising engineers and contract employees. CW #2 was also responsible for outsourcing much of CPI's engineering and design services work to outside contractors. In that capacity, CW #2 oversaw the preparation of bid proposals for those projects. CW #2 also reviewed bid submissions, which involved conducting technical and commercial evaluations. In that capacity, CW #2 had influence over the process by which Con Ed determined which outside contractors would be awarded contracts. Once the projects commenced, CW #2 oversaw the work performed by the outside contractors, reviewed their invoices and passed the invoices through Con Ed's chain of command for payment.

27. According to CW #2, from approximately 2003 through 2011, CW #2 accepted cash kickbacks from the defendant RODOLFO QUIAMBAO in connection with projects Rudell performed for CPI that were supervised by CW #2. Specifically, CW #2, among other things, (1) steered Con Ed work to Rudell; (2) reviewed and modified Rudell's proposals before they were submitted to Con Ed; (3) advised the defendant about the amount that Rudell should bid for a Con Ed project, including, at times, advising the defendant to increase his bid; and (4) supported the award of "sole source" contracts to Rudell.

28. Based on my review of Con Ed's records, between November 1, 2006 and January 2011, Rudell was awarded numerous Con Ed contracts within CPI for electrical design services, the group managed by CW #2.

---

from the defendant. CW #2 subsequently pleaded guilty, pursuant to a cooperation agreement, to receiving cash bribes from the defendant, in CW #2's capacity as an employee of Con Ed, in violation of 18 U.S.C. § 666(a)(1)(B). In exchange for this cooperation, CW #2 is hoping to receive leniency at sentencing. CW #2's information has been corroborated by, among other things, emails, witness statements and information from cooperating witnesses. CW #2 worked for Con Ed from 1983 until 2012.

B. Payments from Defendant to CW #2

29. CW #2 has advised that the defendant RODOLFO QUIAMBAO paid CW #2 cash, contained in envelopes, which CW #2 received in, among other places, QUIAMBAO's office at Rudell's office in Queens, New York and in QUIAMBAO's car. In general, QUIAMBAO paid CW #2 once a month or once every two months, in amounts ranging from approximately $3,000 to $5,000. CW #2 never disclosed to Con Ed's General Auditor or anyone else at Con Ed that he was receiving money from QUIAMBAO.

30. I have reviewed Rudell's financial records which reflect that between November 2007 and December 2010, there were at least 28 checks issued from Rudell to the defendant RODOLFO QUIAMBAO, totaling approximately $274,000. All of these checks were cashed at Chase Bank. The memo sections of each check referenced "public improvement," "public improv," "public impr" or "public." Based on my training and experience, and knowledge of the investigation, I believe that these notations referred to "CPI," the group managed by CW #2. These checks appear to have been endorsed by the defendant RODOLFO QUIAMBAO.

C. EMAILS BETWEEN THE DEFENDANT AND CW #2

31. CW #2 advised that beginning in approximately 2009 or 2010, CW #2 and the defendant RODOLFO QUIAMBAO corresponded about Con Ed business via CW #2's personal email account and the defendant's business email account. Specifically, CW #2 and the defendant would correspond about proposals prepared by Rudell before they were submitted to Con Ed. Once the proposals were finalized, the defendant would submit them to CW #2 via CW #2's Con Ed business email address. This conduct was improper under Con Ed's standards of business conduct.

32.     I have examined copies of emails that were sent between the defendant RODOLFO QUIAMBAO's business e-mail address at Rudell and CW #2's personal email. These emails show communications in which, among other things, the defendant sent CW #2 bid proposals for his review before they were submitted to Con Ed and solicited CW #2 for his opinions regarding Con Ed projects on which Rudell was bidding at the time, some of which were supervised by CW #2 and some of which were projects supervised by other Con Ed employees.

33.     In some of the email replies, CW #2 suggested that the defendant RODOLFO QUIAMBAO make specific changes to both the text and proposed bid amounts of Rudell's original bid proposals. In addition, CW #2 provided the defendant with information he had requested, as well as suggestions on how to include this information in Rudell's bid proposals.

34.     Based on my review of CW #2's personal emails, it appears that CW #2 assisted the defendant RODOLFO QUIAMBAO with at least fifteen Con Ed bid proposals.

35.     For example, on July 28, 2010 at 2:53 pm, an email was sent from the defendant RODOLFO QUIAMBAO's email address to CW #2's personal email. Attached to this email was Rudell's bid proposal for a CPI project called the "Extension of the Atlantic Avenue . . . Queens, New York." The e-mail stated "[CW #2], Attached is our priced proposal on the 'Pre-engineering Support Services' relating to the GJDC and NYEDC joint project involving the extension of the Atlantic Avenue and Conversion of the 94th & 95 Avenues into a One-way Street in Queens, New York, per your July 26, 2010 e-mail request regarding the above project for your review and comments. We hope you find it in order. Please advise. Thank you. Very Truly Yours." Using the personal email account, CW #2 replied to the email

12

later that evening at 9:29 pm. CW #2 sent a revised version of the bid proposal and wrote, "Please use the attached doc. file. I deleted some minor items. Thank You." The defendant RODOLFO QUIAMBAO subsequently submitted the revised bid proposal to Con Ed using Rudell's e-mail address to CW #2's Con Ed email.

36. Based on my review of Con Ed records, the defendant RODOLFO QUIAMBAO was awarded this contract, which was approved by CW #2.

37. I have reviewed an email, dated August 11, 2010 at 10:21 am, sent from the defendant RODOLFO QUIAMBAO's email address to CW #2's personal email. The email included an attachment containing Rudell's proposed bid for a CPI project called the "DDC Project MED 596," which, based on Con Ed records, refers to a waste tunnel project in Manhattan. The e-mail stated "[CW #2], Kindly review and comment on the attached proposal for the above project. Thanks." CW #2 replied later that same evening, at 7:53 pm; he sent a revised version of the bid proposal and wrote, "[u]se this and call me if you have any questions." On August 12, 2010, a reply email was sent to CW #2 from the defendant RODOLFO QUIAMBAO's e-mail address, which stated "This is very good. I'll be sending this . . . now." The defendant subsequently submitted the revised bid proposal to a different supervisor at Con Ed using the Rudell e-mail address.

38. I have reviewed and compared the attachments contained in the defendant's August 11, 2010 email and CW #2's reply email. CW #2's email contained several revisions to the defendant's original bid proposal, including reducing the number of design technicians proposed by the project from two to one, which reduced the bid proposal bid amount by $18,000.

39.     Based on my review of Con Ed records, the defendant RODOLFO QUIAMBAO was awarded this contract.

40.     I have reviewed a series of email exchanges between the defendant RODOLFO QUIAMBAO's email address and CW #2's personal email, from December 7, 2010 and December 15, 2010, regarding Rudell's bid proposal for a CPI project called the "Hyland Blvd Section U package," in Staten Island.  In these emails, CW #2 appears to make multiple revisions and suggestions to the defendant's bid proposal.

41.     Based on my review of Con Ed records, the defendant RODOLFO QUIAMBAO was awarded this contract, which was approved by CW #2.

III.    The Defendant's Bribery of CW #3

   A.   The Bribery Scheme

42.     A cooperating witness ("CW #3") is a former employee of Con Ed and was an engineering supervisor in the Mapping Department, which was responsible for maintaining Con Ed's required operating facility maps, plates and records.[4]  CW #3's duties included ensuring that all mapping of Con Ed facilities in Manhattan was up-to-date.  To accomplish this mission, CW #3 supervised a team of Con Ed employees and contractors that worked within the Mapping Department, that were tasked with updating and maintaining all Con Ed maps for the borough of Manhattan.

---

[4] CW #3 pleaded guilty in February 2015, pursuant to a cooperation agreement, to receiving bribes in the form of checks from the defendant, in CW #3's capacity as an employee of Con Ed, in violation of 18 U.S.C. § 666(a)(1)(B).  In exchange for this cooperation, CW #3 is hoping to receive leniency at sentencing.  CW #3's information has been corroborated by, among other things, bank records, business records and information from cooperating witnesses.  CW #3 worked for Con Ed from 1988 until January 2015.

43. According to CW #3, from approximately 2000 through 2010, CW #3 accepted kickbacks in the form of checks from the defendant RODOLFO QUIAMBAO in connection with projects the defendant performed for Con Ed that were supervised by CW #3. Specifically, CW #3, among other things, (1) steered Con Ed projects to Rudell; (2) supported the award of sole source contracts to Rudell; and (3) recommended Rudell to other Con Ed employees.

44. Based on my review of Con Ed's records, between 2000 to 2010, Rudell was awarded numerous Con Ed contracts within the Mapping Group in the amount of approximately $6.9 million dollars.

B. Defendant's Payments to CW #3

45. Between 2000 and December 2010, the defendant RODOLFO QUIAMBAO gave CW #3 kickbacks in the form of checks made out to a company owned by CW #3 ("the CW #3 Company") in connection with projects Rudell performed for Con Ed that were supervised by CW #3. According to CW #3, the defendant RODOLFO QUIAMBAO paid CW #3 checks, contained in envelopes, which CW #3 received in, among other places, CW #3's cubicle at Con Ed's office, in Manhattan. CW #3 saw that the checks from QUIAMBAO referenced in the memo line projects that Rudell was working on with Con Ed, which were supervised by CW #3. The defendant paid CW #3 approximately once a month, in amounts ranging from $2,000 to $8,000.

46. According to CW #3, the CW #3 Company was funded primarily by payments by the defendant RODOLFO QUIAMBAO, and CW #3 used the money for CW #3's personal use. CW #3 stated that QUIAMBAO had suggested that CW #3 set up a company

and that QUIAMBAO assisted CW#3 in setting up that company. The CW #3 Company was later used for the purpose of receiving bribe payments from QUIAMBAO. CW #3 never disclosed to Con Ed that CW #3 had set up a company or that he was receiving money from QUIAMBAO.

47. I have reviewed bank accounts for the CW #3 Company that reflect that the defendant RODOLFO QUIAMBAO made payments to CW #3 via checks made out to the CW #3 Company.

48. Between January 2007 and December 2008, approximately 28 checks were issued from Rudell to the CW #3 Company for approximately $ 97,500. These checks appear to have been signed by the defendant RODOLFO QUIAMBAO.

49. CW #3 advised that after the 2009 Con Ed Arrests, CW #3 noticed that the checks CW #3 received from the defendant were issued by Rudicon and not Rudell. Bank records reflect that from January 30, 2009 – after the announcement of the 2009 Con Ed arrests — and December 22, 2010, approximately 28 checks, totaling approximately $112,500, were issued from Rudell to Rudicon. About 28 corresponding checks were then issued from Rudicon to CW #3's Company, for approximately $ 112,500. These checks appear to have been signed by the defendant RODOLFO QUIAMBAO. Based on my training and experience and knowledge of the investigation, it appears that the defendant RODOLFO QUIAMBAO issued checks from Rudicon – a company he owned that did not receive any payments from Con Ed – to the CW #3 Company in order to conceal his payments to CW #3.

50. Notably, many of the checks issued from Rudell to Rudicon referenced in the memo line specific projects that Rudell was currently performing for Con Ed, which, according to CW #3, were supervised by CW #3. In general, after the issuance of such checks

from Rudell to Rudicon, checks in approximately the same amount were issued from Rudicon to the CW #3 Company. Many of these checks also referenced the same Con Ed project.

51. For example, a check dated March 28, 2009 in the amount of $4,000 was issued from Rudell to Rudicon. A subsequent check dated March 30, 2009 for the same amount was then issued from Rudicon to CW #3's Company. The memo section of both checks contained references to "Maps," which, according to CW #3, is a reference to the group supervised by CW #3.

52. Similarly, a check dated July 28, 2010 in the amount of $4,500 was issued from Rudell to Rudicon. A subsequent check, dated July 30, 2010, was then issued from Rudicon to CW #3's Company, for the same amount. The memo sections of both of these checks referenced "Maps."

IV.  Defendant's Statements to CW #1

53. In and around January or February 2009, CW #1 and the defendant RODOLFO QUIAMBAO traveled to the Middle East together. According to CW #1, during this trip, QUIAMBAO told CW #1 that Rudell was receiving a lot of Con Ed work from CW #2 and another Con Ed employee, which based on the investigation and on the identifying information provided by CW #1, was CW #3. According to CW #1, QUIAMBAO then remarked that prior to leaving on this trip, he had forgotten to pay CW #2 and CW #3. Immediately after making this statement, QUIAMBAO told CW #1 in sum and substance, to forget about the conversation.

V.  Defendant's Admissions to the Government

54. On January 25, 2011, the defendant RODOLFO QUIAMBAO was interviewed at Rudell's offices by law enforcement agents and investigators and admitted to

paying CW #1 money in exchange for CW #1's influence at Con Ed. The defendant was interviewed two times that day, once at approximately 11:30 a.m., and the second time at approximately 4:30 p.m.

55. During the first interview, the defendant RODOLFO QUIAMBAO stated that Rudell worked for Con Ed as a contractor, but denied that he paid Con Ed employees and denied that he paid money to companies controlled by Con Ed employees.

56. During the second interview, law enforcement agents and investigators asked the defendant RODOLFO QUIAMBAO, among other things, about multiple checks issued from Rudell and Rudicon to a company controlled by CW #1, and informed him that CW #1 had been arrested on charges of bribery. In response, QUIAMBAO stated, in sum and substance, that he paid money to CW #1 in exchange for CW #1's assistance with Con Ed contracts, and that QUIAMBAO decided how much money to pay CW #1. Specifically, QUIAMBAO admitted that he paid CW #1 so that CW #1 would, among other things, ensure that Rudell would be placed on Con Ed's "bidding list" for projects and so that CW #1 would approve additional expenses submitted by Rudell in connection with Con Ed projects. In addition, QUIAMBAO admitted that CW #1 provided him with the names of other companies that were bidding on certain Con Ed projects.

57. During the second interview, the defendant RODOLFO QUIAMBAO further stated, in sum and substance, that he paid CW #1 a percentage of the value of the contracts Rudell obtained from Con Ed projects supervised by CW #1, but that the percentage varied. Moreover, QUIAMBAO admitted that he paid CW #1 via checks issued from Rudell or Rudicon to a company controlled by CW #1. QUIAMBAO, however, continued to deny that he paid any other employees of Con Ed.

WHEREFORE, your deponent respectfully requests that the defendant RODOLFO QUIAMBAO, be dealt with according to law.

*[signature: Madeline Gorra]*
MADELINE GORRA
Special Agent, Internal Revenue Service

Sworn to before me this
21 day of May, 2015

*[signature]*
THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK